**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

IN RE:

| | |
|---|---|
| **ENGLAND MOTOR COMPANY,** | |
| **HAPPY DAY MOTORS, INC. and** | **CONSOLIDATED** |
| **ENGLAND HOLDINGS, INC.,** | **CASE NO. 08-15221-NPO** |
| **DEBTORS.** | **CHAPTER 7** |

**MEMORANDUM OPINION ON MOTION TO TERMINATE**
**THE AUTOMATIC STAY, AND FOR ABANDONMENT**

This matter came before the Court for hearing on September 9, 2009 (the "Hearing"), on the

Motion to Terminate the Automatic Stay, and for Abandonment ("Motion") (Dkt. No. 171) filed by

Guaranty Bank and Trust Company ("Guaranty Bank"), and the Answer to Guaranty Bank and Trust

Company's Motion to Terminate the Automatic Stay and for Abandonment ("Answer") (Dkt. No.

173) filed by the chapter 7 case trustee, Stephen P. Livingston (the "Trustee"). At the Hearing, Jim

F. Spencer, Jr. represented Guaranty Bank, and the Trustee represented himself. After the Hearing,

the Court directed Guaranty Bank and the Trustee to submit letter briefs addressing two issues: (1)

whether Guaranty Bank's claim and debt are mutual obligations within the meaning of 11 U.S.C. §

553(a)(3); and (2) whether the Trustee's strong-arm powers under 11 U.S.C. § 544 take priority over

Guaranty Bank's setoff rights. The Court has received the letter briefs from the parties and, after

having considered the arguments of counsel and the pleadings, finds that the Motion should be

granted in part and denied in part for the reasons that follow.[1]

---

[1] The following constitutes the findings of fact and conclusions of law of the Court
pursuant to Federal Rule of Bankruptcy Procedure 7052 and 9014.

## Jurisdiction

This Court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G). Notice of the Hearing on the Motion was proper under the circumstances.

## Facts

1.      On December 3, 2008, (the "Petition Date") England Motor Company ("England Motor") and Happy Day Motors, Inc. ("Happy Day") filed voluntary petitions for relief under chapter 7 of the United States Bankruptcy Code[2] in Case Nos. 08-15221-NPO and 08-15222-NPO, respectively. On that same day, Perry N. England ("England") filed his personal, voluntary petition for relief under chapter 7 in Case No. 08-15224-NPO.

2.      Almost two months later, on January 23, 2009, England Holdings, Inc.[3] ("England Holdings") filed its voluntary petition for relief under chapter 7 of the Bankruptcy Code in Case No. 09-10289-NPO.

3.      England is the president of all three companies: England Motor, Happy Day, and England Holdings (collectively the "England Entities") and is the sole owner of England Holdings. (Cred. Mtg. Tr. 6, Jan. 9, 2009; Consol. Hr'g Tr. 2, July 17, 2009). England Holdings is the parent company of England Motor and Happy Day. (Consol. Hr'g Tr. 12).

4.      England Motor and Happy Day operated, respectively, as a Ford and Honda

---

[2] The United States Bankruptcy Code, located at Title 11 of the United States Code, hereinafter will be referred to as the "Bankruptcy Code," and all code sections hereinafter will refer to the Bankruptcy Code unless specifically noted otherwise.

[3] Although England Holdings, Inc. is sometimes referred to as "England Holding Company," this Court uses the name that appears on the bankruptcy petition. (Dkt. No. 1, Case No. 09-10289-NPO).

automobile dealership in Greenville, Mississippi. (Consol. Hr'g Tr. 2-3). Happy Day came into existence in order to facilitate England's acquisition of a Honda franchise because American Honda Motor Co., Inc. required, as a condition for the sale of its franchise, the existence of a corporation separate from England Motor, the owner of the Ford franchise. (Consol. Hr'g Tr. 21). England Holdings was formed as an "umbrella" corporation for reasons that England described as "accounting purposes." (Consol. Hr'g Tr. 21).

5.      England Holdings, England Motor, and Happy Day functioned as one going-concern under the name "England Motor Company." (Consol. Hr'g Tr. 21). According to England, the public at large would have no reason to associate either "England Holdings" or "Happy Day" with the automobile dealership. (Consol. Hr'g Tr. 26). The three England Entities, however, were formed as separate corporations prior to the filing of their respective bankruptcy petitions. (Auto. Stay Hr'g Tr. 5-6, Sept. 9, 2009).

6.      England Holdings was the sole borrower on a line of credit from Guaranty Bank in the

approximate amount of $1 million, as evidenced by two promissory notes ("Loans"):

a.  Loan No. 645737444, dated February 5, 2007, in the original principal amount of $757,417.30 (Ex. A, Dkt. No. 6); and

b.  Loan No. 4601350959, dated June 13, 2008, in the original principal amount of $300,275.00 (Ex. C, Dkt. No. 6).

7.      As security for the Loans to England Holdings, England, in his capacity as president of England Motor, executed two deeds of trust in favor of Guaranty Bank on certain real property owned by England Motor in Greenville, Mississippi. (Exs. B & D, Dkt. No. 6).

8.      England used the proceeds of the Loans to finance and operate both England Motor

and Happy Day, and, in that regard, would instruct Guaranty Bank to deposit draws from the Loans directly into the bank account of either England Motor or Happy Day, depending upon which dealership needed the funds. (Cred. Mtg. Tr. 8-10). Guaranty Bank did not require England Holdings to maintain an account at Guaranty Bank as part of its lending arrangement, and England did not open such an account for England Holdings on his own initiative.[4] (Cred. Mtg. Tr. 10-11; Aff. of Naaman, Dkt. No. 14-1,Ex. B; Case No. 08-15222-NPO). England Holdings never directly received or used any of the proceeds from the Loans. (Cred. Mtg Tr. 11-12). Only England Motor made payments on the Loans to Guaranty Bank. (Cred. Mtg. Tr. 12; Aff. of Naaman, Dkt. No. 14-1; Case No. 08-15222-NPO).

9.      England closed both automobile dealerships, England Motor and Happy Day, on December 3, 2008, the Petition Date. (Consol. Hr'g Tr. 6).

10.     As of the commencement of its bankruptcy case, England Holdings owed Guaranty Bank the principal amount of $959,505.12. (Claim 22-1).

11.     This Court lifted the automatic stay in the bankruptcy cases of both England Motor and England Holdings to allow Guaranty Bank to foreclose on the real property pledged by England Motor to secure the debt of its parent company, England Holdings. (Dkt. No. 33; Dkt. No. 7, Case No. 08-15224-NPO). After applying the proceeds from the foreclosure sales, the outstanding balance of the Loans owed by England Holdings to Guaranty Bank was reduced to a deficiency of $638,961.22, not including interest and attorneys' fees. (Dkt. No. 171).

---

[4] It is unknown why Guaranty Bank did not structure the Loans so that the proceeds would secure England Holdings' debt when Guaranty Bank deposited them into the accounts. In an affidavit submitted in support of its efforts to reopen the bankruptcy case of Happy Day, Mickey Naaman, the president of Guaranty Bank, testified that the loans were made to England Holdings "because England's prior lender had structured its loan documents in that manner." (Aff. of Naaman, Dkt. No.14-1, Case No. 08-15222-NPO).

12.     At some point after the England Entities had commenced their bankruptcy cases, Guaranty Bank discovered that as of the Petition Date, England Motor and Happy Day had a combined balance of $248,199.67 on deposit at Guaranty Bank. (Auto. Stay Hr'g Tr. 8; Aff. of Naaman, Dkt. No. 14-1; Case No. 08-15222-NPO; Dkt. No. 171). The record does not specify the balance in each separate account.

13.     In an attempt to reach the bank deposits of England Motor and Happy Day, Guaranty Bank sought to substantively consolidate the three bankruptcy cases of England Holdings, England Motor, and Happy Day, for the purpose of pooling the assets of England Motor and Happy Day and distributing those assets to the creditors of the now defunct England Entities. (Dkt. No. 14, Case No. 08-15222).

14.     On February 19, 2009, Guaranty Bank filed identical substantive consolidation motions in the bankruptcy cases of England Motor (Dkt. No. 37) and England Holdings (Dkt. No. 11, Case No. 09-10289-NPO) on the ground that England treated them as a single consolidated enterprise. Guaranty Bank was unable to seek such relief in the bankruptcy case of Happy Day because it had been closed shortly after the Trustee, who was apparently unaware of the deposits at Guaranty Bank, had filed a report of "no distribution." (Dkt. No. 12 , Case No. 08-15222-NPO).

15.     At Guaranty Bank's request, this Court reopened the bankruptcy case of Happy Day on March 10, 2009 (Dkt. No. 16, Case No. 08-15222-NPO), which paved the way for Guaranty Bank to file a Motion for Substantive Consolidation in Happy Day. Guaranty Bank promptly did so on March 12, 2009. (Dkt. No. 17, Case No. 08-15222-NPO).

16.     After an evidentiary hearing on July 17, 2009 (the "Consolidation Hearing") and in the absence of any objection, this Court substantively consolidated the bankruptcy cases of England

Motor, Happy Day, and England Holdings into Consolidated Case No. 08-15221-NPO (the

"Consolidation Order"). (Dkt. No. 144).   The Consolidation Order provided that it should not be

"considered a finding on the merits of whether Guaranty Bank is entitled to relief from the stay to

seek set off of any bank accounts of either England Motor Company or Happy Day Motors, Inc."

(Dkt. No. 144).

 17. Guaranty Bank filed the Motion under consideration to obtain relief from the

automatic stay imposed by 11 U.S.C. § 362(b)(7) so that it may exercise its right to setoff the funds

in the deposit accounts of Happy Day and England Motor against the outstanding balance owed by

England Holdings on the Loans. (Dkt. No. 171).

 18. None of the England Entities, nor any of their other creditors, filed a pleading in

opposition to, or in support of, the Motion.

 19. The Trustee, however, opposed the Motion on the ground, as set forth in his Answer

and in his letter brief, that the evidence presented by Guaranty Bank was insufficient either to

establish mutuality or to overcome the "strong arm" provision of 11 U.S.C. § 544. (Dkt. No. 173;

Auto. Stay Hr'g Tr. 8).

**Discussion**

**A. Setoff under the Bankruptcy Code: § 553**

 If Guaranty Bank can establish an unconsummated setoff right to the deposit accounts of

England Motor and Happy Day, it will enjoy an advantage over other general unsecured creditors of

England Holdings.[5] John C. McCoid, II, Setoff: Why Bankruptcy Priority? 75 Va. L. Rev. 15 (1989)

---

[5] Guaranty Bank is one of the largest unsecured creditors of England Holdings (Claim
22-1), and according to the Trustee, will probably receive the largest share of the deposits even
in the absence of a setoff.  (Dkt. No. 173; Auto. Stay Hr'g 8).

(discussing history of § 553 as exception to the fundamental policy in bankruptcy law of equality of distribution among unsecured creditors).  This is so because the effect of setoff is to elevate an otherwise unsecured claim to secured status.  *See* 11 U.S.C. § 506(a) ("allowed claim of a creditor . . . that is subject to setoff under § 553 of this title, is secured claim . . . to the extent of the amount subject to setoff.")  Through the right of setoff, Guaranty Bank seeks full-dollar-value credit against the amount it owes England Motor and Happy Day.

At common law, the right of setoff arose by operation of law as a practical tool to eliminate unnecessary transactions between parties holding mutual debts.  In re Braniff Airways, Inc., 42 B.R. 443, 448 (Bankr. N.D. Tex. 1984).  As explained by the United States Supreme Court in Citizens Bank of Maryland v. Strumpf, 516 U.S. 16 (1995), "[t]he right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'"  Strumpf, 516 U.S. at 18 (citation omitted).  In Mississippi, if certain conditions are met–principally mutuality and maturity–a bank has a common law right to apply a customer's deposit to payment of his debt to the bank then due and owing, without the customer's consent.  Deposit Guar. Nat'l Bank v. B.N. Simrall & Son, Inc., 524 So. 2d 295, 299-300 (Miss. 1987).  In Moreland v. People's Bank of Waynesboro, 74 So. 828 (Miss. 1917), the Mississippi Supreme Court explained:

> It is well settled that the bank itself has a right, if it so desires, to apply whatever amount the maker of the note has on deposit with it to a payment on the note.  Or, in other words, the bank itself has the right to set off the amount it owes the depositor against the amount owed it by the depositor.  The relation existing between a bank and a depositor is simply one of debtor and creditor.

Moreland, 74 So. at 829-30.

Section 553 continues the long-recognized right of setoff for mutual debts arising before bankruptcy. *See, e.g.*, The Bankruptcy Act of 1898, ch. 541, § 68, 30 Stat. 544, 565 (repealed 1978).

The Supreme Court described the role of § 553, as follows: "Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." Strumpf, 516 U.S. at 18. Section 553(a) provides, in relevant part:

> [T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

11 U.S.C. § 553(a). Thus, § 553 does not create any independent right of setoff, but merely preserves whatever setoff right a creditor already may have under state law. Additionally, however, the granting or denial of the right to a setoff depends upon whether the creditor has met the requirements set forth in § 553 and whether any of the exceptions[6] set forth in that provision applies. *See, e.g.*, Dollar Bank v. Tarbuck (In re Tarbuck), 318 B.R. 78, 81 (Bankr. W.D. Pa. 2004). These additional bankruptcy requirements include the following conditions upon the right of setoff: (1) the creditor must hold a pre-petition claim against the debtor; (2) the creditor must owe a pre-petition debt to the debtor; (3) the claim and debt must be mutual obligations; and (4) the claim and debt each must be valid and enforceable. 5 Collier on Bankruptcy ¶ 553.01[1] (15th ed. rev. 2009).

The parties agree that both Guaranty Bank's claim and its debt arose pre-petition. Guaranty Bank's claim against England Holdings arose upon default of payment of the Loans, and its debt to England Motor and Happy Day arose upon the deposit of funds from the Loans to their bank accounts, when a debtor/creditor relationship was formed between Guaranty Bank and the two dealerships. B.N. Simrall & Son., Inc., 524 So. 2d at 299 (bank owns funds deposited in account,

---

[6] For example, a setoff made within ninety days of bankruptcy is vulnerable under § 553(b) to recovery by the trustee if the trustee can meet the criteria contained in subsections 1 and 2 of that provision.

and bank is a debtor to the owner of the account for the amount deposited); Moreland, 74 So. at 830

(depositor holds an unsecured claim against the bank in the amount of his account balance, that is

payable upon demand). These events apparently took place before the Petition Date.[7]  There is also

no dispute that Guaranty Bank's claim and debt are valid and enforceable.[8]  The issue before this

Court, insofar as Guaranty Bank's right of setoff is concerned, is whether Guaranty Bank has met

its burden of showing by a preponderance of the evidence that its obligation to England Motor and

Happy Day and its claim against England Holdings for nonpayment of the Loans are "mutual" for

purposes of § 553.

### 1. Mutuality Requirement

The Bankruptcy Code does not define the term "mutuality;" however, it is well settled that

the right of setoff exists only when there is mutuality and, in turn, that mutuality exists only when

the claim and the debt are due to and from the same person.  Braniff Airways, Inc. v. Exxon Co.,

U.S.A., 814 F.2d 1030, 1036 (5th Cir. 1987).  The test of mutuality does not require that the

obligations be similar, only that they be owed between the same parties.  When applied to deposit

accounts, mutuality means that the bank must owe its customer and the same customer must owe

the bank.  Here, Guaranty Bank seeks to offset the debt England Holdings owes Guaranty Bank

against the debt Guaranty Bank owes to England Holdings' subsidiaries, England Motor and Happy

Day.   Guaranty Bank acknowledges in its letter brief, however, that the mutuality requirement

precludes a triangular setoff, where "A" tries to offset a debt it owes "B" against a debt of "B" owed

---

[7] Guaranty Bank does not specify in its Motion when England Holdings defaulted on the
Loans.  The Trustee, however, does not dispute that the default occurred pre-petition.

[8] The Trustee does not argue that any of the limitations to the preferential effect of setoff
applies.  See 11 U.S.C. § 553.

to "C,"[9] rather than directly to "A." <u>Sherman v. First City Bank of Dallas (In re United Sciences of Am., Inc.)</u>, 893 F.2d 720, 723 (5th Cir. 1990). Guaranty Bank does not dispute that in general a subsidiary may not setoff a debt owed to a bankrupt against a debt owed by the bankrupt to a different, but related, subsidiary. <u>Eckles v. Petco Inc. (In re Balducci Oil Co., Inc.)</u>, 33 B.R. 847, 852-53 (Bankr. Colo. 1983). Guaranty Bank, however, asserts that this situation does not fit within the fact pattern of an impermissible triangular setoff. Given that England Holdings borrowed the money, but that the account deposits belong to England Motor and Happy Day, there can be no other conclusion. <u>Depositors Trust Co. v. Frati Enters.</u>, 590 F.2d 377, 379 (1st Cir. 1979) (in the corporate context, it is well established that one subsidiary may not setoff a debt owed to a bankrupt against a debt owing from the bankrupt to another subsidiary). England Holdings may be closely related to England Motor and Happy Day but they are all three separate, identifiable corporate entities. *See* <u>Jones v. United States (In re Jones)</u>, 107 B.R. 888, 897 (Bankr. N.D. Miss. 1989) (corporation and its principal stockholder are not mutual entities to which setoff can apply).

Guaranty Bank maintains, however, that there are three alternative reasons why mutuality nevertheless exists: (1) because England Holdings was substantively consolidated with England Motor and Happy Day into a single entity; (2) because several formal agreements exist between Guaranty Bank and England Motor; and (3) because England Holdings, England Motor, and Happy Day functioned, for practical purposes, as a single entity. The Court will address each of these arguments in turn. In doing so, this Court is obliged to construe the definition of mutuality strictly, given that § 553 represents a limited departure from the fundamental policy of bankruptcy law against preferential treatment of creditors of like status. <u>Jones</u>, 107 B.R. at 898

---

[9] In such scenarios, "C" is often an affiliate of "A."

## 2. Substantive Consolidation

Guaranty Bank claims in its Motion that the requisite mutuality exists because of the substantive consolidation of the three bankruptcy cases, which had the effect of pooling the assets and liabilities of all three England Entities into a single entity. Simply put, Guaranty Bank argues that the debts became mutual when Guaranty Bank became a creditor of, and a debtor to, all three corporations, and vice versa. (Dkt. No. 171). Even if this is so, Guaranty Bank's debt arose as a result of the Consolidation Order, and, thus, arose *after* the commencement of the bankruptcy cases. *See* Palm Beach County Board of Public Instr. v. Alfar Dairy, Inc.(In re Alfar Dairy, Inc.), 458 F.2d 1258, 1262 (5th Cir. 1972) (attempt to offset pre-petition debt against post-petition credit or vice versa is improper for lack of mutuality); In re Enron Creditors Recovery Corp., 376 B.R. 442, 464-66 (Bankr. S.D.N.Y. 2007) (under Bankruptcy Code post-petition debt could not be offset against pre-petition claim). Yet, § 553 requires that the claim and debt both arise pre-petition. Hill v. Farmers Home Admin. (In re Hill), 19 B.R. 375, 380 (Bankr. N.D. Tex. 1982). Therefore, for the Consolidation Order to create mutuality, this Court must give the substantive consolidation of the cases retroactive effect before the Petition Date, relief that this Court is loathe to provide. *See* Murray Indus., Inc. v. Dep't of Revenue (In re Murray Industries, Inc.), 125 B.R. 314, 317 (Bankr. M.D. Fla. 1991) ("It would certainly be a violation of due process if the order of substantive consolidation would operate to destroy defenses and rights which existed prior to the entry of the order of substantive consolidation.")

Clearly, the purpose of the Consolidation Order was to facilitate administration of the bankruptcy estates by pooling all assets of the three England Entities and by granting *all* their creditors (not just Guaranty Bank) their share of the pooled assets in accordance with their respective rights. The purpose of the Consolidation Order was not to create or destroy defenses and

rights so that Guaranty Bank could reap the benefits of setoff.  At the Hearing, Guaranty Bank abandoned its substantive consolidation argument, and rightly so. (Auto. Stay Hr'g Tr. 6).

### 3. Purported Contractual Exception to Impermissible Triangular Setoff

Guaranty Bank argues in its letter brief that an exception to the general rule prohibiting triangular setoffs applies in this case because of the existence of several formal agreements between Guaranty Bank and England Motor.  Guaranty Bank relies upon case law raising the possibility that parties may dispense altogether with the mutuality requirement in § 553 by express agreement. *See* In re Garden Ridge Corp., 338 B.R. 627, 636-37 (Bankr. Del 2006); In re Balducci, 33 B.R. at 853; Wooten v. Vicksburg Ref., Inc. (In re Hill Petroleum Co.), 95 B.R. 404, 412 (Bankr. W.D. La. 1988). Guaranty Bank maintains that certain language found in two recorded deeds of trust and in two corporate resolutions satisfy this purported contractual exception.  England executed all four of these documents in his capacity as president of England Motor. (Exs. B & D, Dkt. No. 6; Exs. E & F, Guaranty Bank's Letter Brief).

As to the deeds of trust, Guaranty Bank points to the "Payment and Performance" paragraphs in which England Holdings and England Motor (as the Grantor) agree to pay Guaranty Bank "all indebtedness secured by this Deed of Trust as it becomes due." (Exs. B & D, Dkt. No. 6). The deeds of trust define the term "indebtedness" broadly: "The word 'indebtedness' means all principal, interest, and other amounts, costs and expenses payable under the [Promissory] Note or Related Documents . . . ." (Exs. B & D, Dkt. No. 6). There is also a "Joint and Several Liability" paragraph in both deeds which states, "All obligations of Borrower and Grantor under this Deed of Trust shall be joint and several . . . ." (Exs. B & D, Dkt. No. 6). There is no provision, however, that expressly allows Guaranty Bank to *offset* England Holdings' obligations against Guaranty Bank's debt to England Motor, and there is no mention whatsoever of Happy Day.

Page 12 of 22

As to the corporate resolutions, Guaranty Bank relies upon the following language that

authorizes England, in his capacity as president of England Motor:

> To mortgage, pledge, transfer . . . or otherwise encumber and deliver to [Guaranty
> Bank] any property now or hereafter belonging to [England Motor] . . . including,
> without limitation, all of [England Motor's] real property and all of [England
> Motor's] personal property (tangible or intangible), as security for the payment of
> any loans, any promissory notes, or any other or further indebtedness of ENGLAND
> HOLDING COMPANY to [Guaranty Bank] at any time owing, however the same
> may be evidenced.

(Ex. E, Guaranty Bank's Letter Brief).

Guaranty Bank claims that the above quoted language from the deeds of trust and the

corporate resolutions renders Guaranty Bank's claim to setoff the funds in the accounts mutual for

purposes of § 553 when mutuality otherwise would be lacking. Although none of the documents

relied upon by Guaranty Bank mentions Happy Day, Guaranty Bank, nevertheless, argues in its

letter brief that they establish the general intent of everyone that the deposits in the bank accounts

of both England Motor and Happy Day secure the Loans to England Holdings, because of the

commingling of funds.

As a preliminary matter, it is worth noting that none of the cases cited by Guaranty Bank for

the legal proposition that parties may contract away the mutuality requirement actually allowed the

requested setoff based on the terms of such a contract. *See* In re Garden Ridge, 338 B.R. at 637

(holding that case did not present a permissible triangular setoff based upon agreement between

related affiliates); In re Balducci, 33 B.R. at 853 (discussing exception in denying summary

judgment motion because of existence of disputed factual issues); In re Hill Petroleum, 95 B.R. at

404 (holding that no agreement existed to apply narrow exception to otherwise improper three-party,

triangular setoff). More importantly, those cases contemplated the existence of an express

agreement granting the right of triangular setoff, which is not present here. As noted previously, the

Page 13 of 22

language cited by Guaranty Bank did not contain so much as a passing reference to Guaranty Bank's

setoff rights against England Motor or Happy Day in the event of England Holdings' default on the

Loans.  Also, the purpose of the corporate resolutions was to identify England as the person with

authority to bind England Motor to grant Guaranty Bank collateral for the Loans but did not obligate

England Motor to do so.  It is therefore unnecessary for this Court to determine whether as a matter

of law parties may vitiate the mutuality requirement in § 553 by entering into an agreement that

expressly contemplates a triangular setoff, since such an agreement clearly does not exist under the

facts presented here.  *See, e.g.,* In re Semcrude, L.P., 399 B.R. 388, 398 (Bankr. Del. 2009)

(discussing disjointed history of contractual exception to mutual debt requirement and holding that

private agreements cannot confer mutuality on non-mutual debts).

### 4. Guaranty Agreement

Guaranty Bank mentions for the first time in its letter brief that the "Payment and

Performance" paragraph in both deeds of trust established England Motor's contractual

responsibility for the entire debt owed by England Holdings to Guaranty Bank and essentially made

England Motor a co-maker and/or guarantor of the Loans.  Although not expressly argued by

Guaranty Bank, if mutuality exists because of England Motor's guaranty obligation, there would be

no need for the purported contractual exception to apply to Guaranty Bank's setoff right against

England Motor's deposit account.[10]

Guaranty Bank cites Bloor v. Shapiro, 32 B.R. 993 (Bankr. S.D.N.Y. 1983), in support of

its position that mutuality exists because of England Motor's status as a guarantor.  In Bloor,

individual owners of several corporations undertook personally "to unconditionally guarantee

---

[10] The deeds of trust do not refer to Happy Day and thus cannot establish mutuality as to
Happy Day's deposit account.

payment of any and all sums payable" under loans made by the debtor to their various corporations. Bloor, 32 B.R. at 995-98. In a lawsuit brought by the trustee to enforce the personal loan guarantees, the owners sought to exercise the right to setoff their claims against the debtor for its alleged breaches of collateral agreements to provide additional financing. Id. at 998. The trustee argued that the mutuality requirement precluded the owners' setoff claims. Id. at 1001. The Bloor court held that even though the owners were not parties to the collateral agreements, the guaranty agreements under state law permitted the owners to assert the claims of the corporations they controlled against the trustee. Id. at 1001-02.

As previously noted, the right of setoff depends upon the terms of § 553, but the nature, existence, and enforceability of a claim sought to be setoff is determined by applying the law of the state where the operative facts occurred. 5 Collier on Bankruptcy ¶ 553.04 (15th ed. rev. 2009); see Butner v. United States, 440 U.S. 48, 55 (1979). Here, the operative facts occurred in Mississippi where the deeds were executed and accepted. Also, the deeds are governed by Mississippi law by their express terms. (Exs. B & D, Dkt. No. 6).

In Mississippi, the efficacy of the guaranty obligation of England Motor in the deeds of trust presents an issue of contract interpretation. See Shutze v. Credithrift of Am., Inc., 607 So. 2d 55, 59 (Miss. 1992) (treating future advance clause in deed of trust like any other contractual provision). Mississippi's approach to contract interpretation focuses upon the intent of the contracting parties as determined from an objective reading of the words used by the parties in expressing their agreement. One South, Inc. v. Hollowell, 963 So. 2d 1156, 1162 (Miss. 2007). This focus is not nearly so much on what the parties may have intended, but on what their chosen words mean, since the words used by the parties are by far the best resource for determining their intent. Simmons v. Bank of Miss., 593 So. 2d 40, 42-43 (Miss. 1992). In each deed of trust, England Motor agreed to

pay Guaranty Bank all indebtedness secured by the deed as it became due. (Exs. B & D, Dkt. No.
6). Moreover, each deed of trust defined England Motor's obligation as "joint and several." (Exs.
B & D, Dkt. No. 6).

In a case involving a similar guaranty provision, In re Chestnut Co., 39 B.R. 519, 521
(Bankr. D.S.C. 1984), the debtor maintained a checking account with the creditor bank, and the
debtor's principals jointly and severally guaranteed a noted executed by the debtor in favor of the
bank. The Chestnut court found that the debts were mutual, even though the debt owed to the bank
was a joint and several obligation of the debtor and its principals who signed as guarantors, because
the bank had the right to collect the amount due on the note from the debtor alone. Chestnut, 39
B.R. at 522.    Likewise, in this matter, England Motor's obligation to Guaranty Bank is based on
its joint and several obligation to pay England Holdings' debt–an obligation in addition to its
agreement to pledge its interests in the real property subject to the deeds of trust. England Motor's
fortunes (and misfortunes) were closely intertwined with England Holdings,' which used the
proceeds from the Loans to operate both England Motor and Happy Day. Clearly, England Motor
derived some benefit from the Loans, so the structure of the lending arrangement is not surprising.
Because Guaranty Bank has the right to seek payment from England Motor for England Holdings'
indebtedness, this Court finds that mutuality exists between Guaranty Bank's claim and debt as to
England Motor's deposit account but not as to Happy Day's deposit account in the absence of any
similar right by Guaranty Bank to seek payment from Happy Day.

### 5. Piercing the Corporate Veil

Guaranty Bank argues in the alternative that even if the contractual agreements are
insufficient to satisfy the mutuality requirement under § 553, the facts presented here demonstrate
that under Mississippi law both England Holdings and Happy Day were merely the "alter egos" of

England Motor. Guaranty Bank's argument in this regard remains relevant only as to Happy Day's

deposit account, since this Court already has found that mutuality exists for setoff purposes as to

England Motor's deposit account. Simply put, Guaranty Bank contends that this Court should

"pierce the corporate veils" of the England Entities and attribute the assets of England Motor and

Happy Day to their parent company, England Holdings.[11] Guaranty Bank relies on the evidence

presented in support of the Consolidation Order for its contention that the England Entities should

be treated as one single entity for setoff purposes.

The general rule of law in Mississippi is that two or more corporations maintain their distinct

legal identities even though the same individual may own stock in the several corporations and even

though such corporations may have the same person as officers. Murdock Acceptance Corp. v.

Adcox, 138 So. 2d 890, 895 (Miss. 1962). Mississippi holds to the principle that disregarding the

corporate entity is not to be undertaken lightly and is allowed only in those extraordinary factual

circumstances where doing so is necessary to promote the ends of justice. Penn Nat'l Gaming, Inc.

v. Ratliff, 954 So. 2d 427, 431 (Miss. 2007). Specifically, courts in Mississippi will not pierce the

veil of a corporate entity unless the party seeking to treat the entities as a single enterprise

demonstrates: (1) some frustration of expectations regarding the party to whom he looked for

performance; (2) the flagrant disregard of corporate formalities by the principals of the corporation;

---

[11] In general, alter ego claims are property of the bankruptcy estate over which only the trustee has standing to pursue. See S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.), 817 F.2d 1142 (5th Cir. 1987). The Trustee in this proceeding does not challenge Guaranty Bank's standing to rely on the alter ego doctrine to establish its right of setoff, a right specific to Guaranty Bank and no other creditor, but rather challenges the sufficiency of the evidence. Because Guaranty Bank does not stand in the same posture as other creditors, it is unlikely that a challenge to Guaranty Bank's standing would prevail, an argument that is unnecessary for this Court to address given Guaranty Bank's failure to pierce the corporate veils of the England Entities.

and (3) some indication of fraud or other equivalent malfeasance by the corporate principals. Gray v. Edgewater Landing, Inc., 541 So. 2d 1044, 1047 (Miss. 1989).

The only evidence presented by Guaranty Bank at the hearing on the Consolidation Order concerned the second element, the extent to which England disregarded the corporate forms of the England Entities. For example, the testimony elicited by Guaranty Bank from England amply demonstrated that England used England Motor to dominate its parent corporation, England Holdings, and its sister corporation, Happy Day. The following facts in that regard are undisputed: (1) England was president of all the England Entities and the sole owner of England Holdings; (2) England filed consolidated tax returns; (3) England co-mingled funds from the accounts of the two sibling corporations, England Motor and Happy Day; and (4) England Motor routinely paid Happy Day's employees and provided the warranty and repair services associated with the Honda franchise, expenses for which Happy Day reimbursed England Motor. The above evidence, in addition to other similar evidence presented at the Hearing, established a sufficient factual basis for the substantive consolidation of the bankruptcy cases of the England Entities. However, before disregarding the corporate identities, Mississippi law requires evidence of two additional elements, both of which are missing from the facts presented here.

First, the evidence does not show either that Guaranty Bank actually believed that the deposit accounts of England Motor or Happy Day collateralized the Loans to England Holdings or that Guaranty Bank would have been justified in holding such a belief. Clearly, at all times before the bankruptcy cases were filed, Guaranty Bank was aware of the existence of the England Entities as three separate corporations. It was certainly within Guaranty Bank's prerogative to safeguard its setoff right, for example, by requiring England Holdings to maintain a checking account at its institution or by having England sign a security agreement on behalf of all the England

Entities–options that Guaranty Bank failed to undertake.

More importantly, Guaranty Bank has failed to present any evidence whatsoever that England formed any of the England Entities for fraudulent or wrongful purposes. *See* Ratliff, 954 So. at 432 (no piercing of corporate veil in absence of evidence of abuse of corporate form). All of the England Entities served a lawful purpose: England Motor was formed to operate the Ford franchise; Happy Day was formed to operate the Honda franchise; and England Holdings was formed as an umbrella corporation for "accounting purposes." Although England Motor was the dominant corporation of the other two subservient England Entities, there is no evidence that England Motor fraudulently used England Holdings or Happy Day or that they were sham corporations. *See* Johnson & Higgins of Miss, Inc. v. Comm'r of Insur., 321 So. 2d 281, 285-86 (Miss. 1975) (separate existence of corporations must be recognized in absence of fraud). The facts presented here are not so extraordinary as to allow Guaranty Bank the remedy of piercing the corporate veils of England Holdings or Happy Day. Richardson v. Jenkins Builders, Inc., 737 So. 2d 1030, 1031-32 (Miss. Ct. App. 1999) (evidence insufficient to pierce corporate veil).

### B. Strong-arm Clause: § 544

Because Guaranty Bank has failed to establish its right of setoff against Happy Day's deposit account, the only remaining issue left for consideration is the Trustee's twofold argument in his one-page letter brief (1) that the strong-arm clause under § 544 "gives the Trustee superior position to the Bank; due to the fact, the Bank has no security interest in the bank account" and (2) that "there was not sufficient proof as to the mutuality to overcome the 'strong arm clause' of § 544 and Trustee's rights as a bonafide [sic] purchaser." The Trustee does not cite any legal authority in support of his position.

Section 544 gives a trustee, as of the date of the bankruptcy filing, the status of a

"hypothetical judicial lien creditor" on all property of the debtor under state law. 11 U.S.C. § 544.

With respect to personal property, this lien represents an interest superior to that of all creditors,

except for those with security interests that are validly created and perfected before the date of the

bankruptcy filing. In other words, an unperfected security interest in personal property is treated

under § 544 the same as an unsecured interest.

　　　The issue raised by the Trustee turns on whether Guaranty Bank had a valid, perfected

security interest in England Motor's deposits before the Petition Date so as to be superior to the

Trustee's lien under § 544(a)(1). In that regard, § 506(a)(1) provides:

> An allowed claim of a creditor . . . that is subject to setoff under section 553 of this
> tittle, is a secured claim . . . to the extent of the amount subject to setoff . . . .

11 U.S.C. § 506(a)(1). Accordingly, § 506(a) treats an otherwise unsecured claim against a debtor

as a secured claim to the extent of the amount of cash otherwise subject to setoff, but not yet setoff,

by the bank on the date of the filing of the bankruptcy petition. Braniff, 42 B.R. at 443. Moreover,

§ 363 treats funds in the deposit account that secures the bank's claim as cash collateral which the

debtor may not use without the bank's consent or the court's approval. 11 U.S.C. § 363(c)(2). This

treatment is consistent with § 553, which states that "[e]xcept as otherwise provided in this section

and in sections 362 and 363, [the Bankruptcy Code] does not affect any right of a creditor to offset

a mutual debt owing by such creditor to the debtor that arose before the commencement of the case

. . . ." 11 U.S.C. § 553(a).

　　　The basis for the Trustee's reliance on § 544 is far from clear. For example, even though the

deposit account constitutes *personal* property under Mississippi law, the Trustee refers to his rights

to the deposit account as a "bonafide [sic] purchaser." Cartwright v. Deposit Guar. Nat'l Bank, 675

So. 2d 847, 848 (Miss. 1996) (defining deposit accounts as intangible personal property). Yet, the

Trustee's avoidance power under § 544(a)(3) as a hypothetical bona fide purchaser applies only to *real* property of a debtor.[12] There is no similar provision granting the Trustee such status with respect to personalty. Also, the Trustee's argument that the strong-arm provision defeats mutuality apparently was intended to challenge Guaranty Bank's contention that mutuality occurred after the Petition Date upon substantive consolidation of the bankruptcy cases of the England Entities, a contention that Guaranty Bank later abandoned. Finally, because Guaranty Bank has not exercised its setoff rights against England Motor's account, there has been no pre-petition transfer of property for the Trustee to "undo" under § 544(a). For these reasons, this Court finds that once established, and except for those exceptions enumerated in § 553, Guaranty Bank's setoff is not subject to challenge by any other provision of the Bankruptcy Code, including § 544.

## Conclusion

Based on the foregoing, the Court finds that the Motion should be granted to the extent that Guaranty Bank seeks a setoff pursuant to § 553 of the amount in England Motor's deposit account as of the Petition Date against the indebtedness owed to Guaranty Bank by England Motor under the guaranty provision in the deeds of trust. The Court further finds that the Motion should be denied as to all other funds in issue. Specifically, the Court finds that Guaranty Bank is not entitled to a setoff of any of the funds in Happy Day's deposit account.

A separate final judgment will be entered in accordance with Federal Rule of Bankruptcy Procedure 9021.

---

[12] Congress added § 544(a)(3) to the Bankruptcy Code in 1978 to render unrecorded transfers of real property invalid against the trustee in bankruptcy. Prior to the amendment, such transfers under § 544 were valid against the trustee despite his status as a "hypothetical judicial lien creditor." *See* Richard B. Levin, An Introduction to the Trustee's Avoiding Powers, 53 Am. Bankr. L.J. 173, 175-76 (1979).

SO ORDERED.

Neil P. Olack
United States Bankruptcy Judge
Dated: January 19, 2010